Brett R. Cohen (SBN 337543)
bcohen@leedsbrownlaw.com
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, New York 11514
Tel:    (516) 873-9550
Fax:    (516) 747-5024

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMANDA DAGHALY, individually and on behalf of all others similarly situated,<br><br>                                        Plaintiffs,<br><br>- against -<br><br>BLOOMINGDALES.COM, LLC, and any related entities,<br><br>                                        Defendants. | **Case No.: 3:23-cv-0129-L-WVG**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**Jury Trial Demanded** |

Plaintiff Amanda Daghaly ("Plaintiff"), individually and on behalf of all others similarly situated, by her attorneys, Leeds Brown Law, P.C., hereby files this class action complaint against Defendant BLOOMINGDALES.COM, LLC, and any related entities ("Defendants"), and in support thereof alleges the following:

## INTRODUCTION

1.       This is a class action brought against Defendants for secretly intercepting and recording the electronic communications of visitors to their website, www.bloomingdales.com, including their scrolling, clicking, and keystrokes.  Defendants use recent developments in technology to surreptitiously record visitors to its website using JavaScript software code that continuously wiretap Internet users'

keystrokes, mouse movements, clicks, webpage locator data, and/or other electronic communications ("Website Communications"). These scripts are placed on a website or app and are responsible for recording the user's actions (the "Session Replay Code"). When a user visits www.bloomingdales.com, the Session Replay Code begins recording their interactions for storage in video form on a server for playback, including by third parties such as FullStory. FullStory developed some of the session recording technology that Bloomingdale is using.

2.      After intercepting and capturing the Website Communications, Defendants use the Session Replay Code to playback website visitors' entire visit to www.bloomingdales.com. Because session replay records every action a user takes on a website, it can also record sensitive information such as login credentials and personal information entered into forms. Defendants' use of Session Replay Code is therefore an unusual and highly offensive form of monitoring and wiretapping sensitive personal data, including data not intended to be shared with third parties such as FullStory.

3.      Defendants also use code developed by Meta Platforms, Inc ("Meta"). This code is known as Meta Pixel and records users' activity on sites all around the Internet and transmits logs of that activity back to Meta (the "Meta Pixel Code.")..

4.      Defendants' conduct violates the Wiretap Act, the California Invasion of Privacy Act, Cal. Pen. Code § 631, the California Business & Professions Code, Cal. Bus. & Prof. Code §§ 17200, 17500 et seq., and constitutes an invasion of the privacy rights of website visitors.

5.      Plaintiff brings this action individually and on behalf of a nationwide class of U.S. residents and a class of all California citizens whose Website Communications were intercepted with Session Replay Code and Meta Pixel Code on www.bloomingdales.com and seeks injunctive relief, compensatory and statutory damages, punitive damages, and attorneys' fees and costs.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PARTIES**

6.      Plaintiff Daghaly is a citizen of the State of California, and at all times relevant to this action, resided and was domiciled in San Diego County, California.

7.      Defendant BLOOMINGDALES.COM, LLC is a citizen of Ohio and New York.  It is a limited liability company organized under the laws of the state of Ohio, and its principal place of business is located at 145 Progress Place, Springdale, OH, 45246.  It can be served through its registered agent Corporate Creations Network Inc. located at 5901 W. Century Blvd., #750 Los Angeles, CA 90045.

**JURISDICTION & VENUE**

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because the First Count of this Class Action Complaint arises under the Wiretap Act, 18 U.S.C. § 2510 et seq., a federal law.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, is a citizen of a state different than at the named Defendant. This Court also has jurisdiction over the Second through Seventh Causes of Action because they are so related to the First Cause of Action over which the Court has jurisdiction as arising under federal law that they form part of the same case or controversy under Article III of the United States Constitution under 28 U.S.C. § 1367(a).

9.      This Court has personal jurisdiction over Defendants because Defendants regularly solicited and transacted business with California residents, including Plaintiff.  Moreover, a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in California. By operating

**FIRST AMENDED CLASS ACTION COMPLAINT**

www.bloomingdales.com in the manner alleged below, Defendants purposefully and tortiously targeted California residents for interception of their private communications, trafficking in their private communications, and exposure of their private data in California.  At all relevant times, Defendants knew that their www.bloomingdales.com practices would intercept and record private information from California residents while those residents accessed www.bloomingdales.com in California.  Defendants targeted California as a principal market of its retail and Internet marketing activities, and purposefully availed itself of the benefits and protections of California law in such a manner as to make it reasonable to apply California law to their marketing and sale of data and goods in California and to California residents.  Moreover, Defendants intentionally or recklessly captured private information in real time from Plaintiff and the other Class Members, whose First through Sixth Causes of Action alleged herein arise from the captures and transmission of their data in California.  Defendants regularly and systematically solicits and does business in California so as to be present in the jurisdiction even when it also has offices elsewhere.

10.     Defendants' connection to California is further distinguished by its relationship with Meta. Meta is a domestic corporation based in California which develops and implements the Meta Pixel Code. As detailed herein, Defendants embed the Meta Pixel Code on its site and have aided and abetting Meta in intercepting user activity.  Thus, Defendants are utilizing a tool developed and operated by a California entity to intercept user data. This creates a substantial connection between Defendants and the State of California.

11.     Defendants knew that Plaintiff and the other Class Members visited and entered data into www.bloomingdales.com while they are physically present in California. Both desktop and mobile versions of Defendants' website refer to California stores as "Pick Up" or "Curbside Pickup" locations.

**FIRST AMENDED CLASS ACTION COMPLAINT**

These websites and the Bloomingdale's app also invited users to search for California stores using their California location information with their device.  Defendants' design of www.bloomingdales.com in this manner and operation of it on a daily basis results in Defendants being continuously informed that California residents are accessing the website and that they are having their communications captured and intercepted in violation California statutory and common law.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue occurred in this District.

## FACTUAL ALLEGATIONS

### A.   *Website Session Data Are Economically Valuable*

13.     Consumers' web browsing histories have an economic value in excess of $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[1] Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[2]

14.     In October 2022, an article published by Forbes Technology Council, an invitation-only venue for Chief Information Officers, Chief Technology Officers, and other technology executives, reported that "third-party JavaScript trackers" were intercepting website visitors' "keystrokes, mouse movements, search terms and form data without the user's explicit knowledge or permission."[3]

---

[1] In re Facebook Internet Tracking Litig., 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.4th 589 (9th Cir. 2020).  There is a "study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories." 956 F.4th at 600.
[2] Ian Cohen, *Are Web-Tracking Tools Putting Your Company at Risk?*, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-at-risk/?sh=26481de07444.
[3] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT**

15.     The World Economic Forum estimated the value of all personalized data to exceed 1 trillion euros in 2020.[4]

16.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[5]

17.     In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars.[6] Moreover, data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information).[7] Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[8] The last estimate probably

---

[4] Vasudha Thirani & Arvind Gupta, The Value of Data, World Economic Forum (Sept. 22, 2017), https://www.weforum.org/agenda/2017/09/the-value-of-data/.
[5] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/our-insights/capturing-value-from-your-customer-data.
[6] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf.
[7] *Id.* at 25.
[8] *Id.* at 31.

**FIRST AMENDED CLASS ACTION COMPLAINT**

reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[9]

### B. Website Users Have a Reasonable Expectation of Privacy When Interacting with Websites

18.      Consumers believe that they can avoid privacy violations such as fraudulent credit card charges or hacking of their online accounts by not using services that collect their personal data. Most Americans surveyed by the Pew Research Center in 2019 reported that they had recently decided to refrain from using a product or service because they thought that they could exercise control over their personal information in this way.[10]

19.      The vast majority of U.S. consumers are unwilling to share their personal data in order to help companies improve their products or services.[11] Most business leaders surveyed by KPMG in 2021 reported that they do not sell customer data to third parties.[12] Nine in ten Americans demand transparency in how their data is used or protected.[13]  The vast majority of Americans "see [online] tracking as never beneficial (64.2%), [but] almost a third of respondents believe it could be acceptable when used to protect them (28.2%)."[14] A similar supermajority of 65% believes Internet service providers can shield them from undesirable online tracking.[15]

---

[9] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.
[10] Andrew Ferrin, Half of Americans have decided not to use a product or service because of privacy concerns, Pew Research Center (Apr. 2020), https://www.pewresearch.org/fact-tank/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.
[11] KPMG, Corporate Data Responsibility: Bridging the Trust Gap 4 (Aug. 2021), https://advisory.kpmg.us/content/dam/advisory/en/pdfs/2021/corporate-data-responsibility-bridging-the-consumer-trust-gap.pdf.
[12] Id. at 2.
[13] Id. at 7.
[14] CUJO AI, CUJO AI Recent Survey Reveals U.S. Internet Users Expectations and Concerns Towards Privacy and Online Tracking, Cision PR Newswire (May 26, 2020), https://www.prnewswire.com/newsreleases/cujo-ai-recent-survey-reveals-us-internet-users-expectations-and-concerns-towardsprivacy-and-online-tracking-301064970.html.
[15] Id.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

*C.  How Session Replay Code Intercepts the Website Communications*

2

20.    Session Replay Code, such as that embedded in www.bloomingdales.com, is a hidden way

3

to track Internet users.

4

21.    Session Replay Code collects and transmits far more information than traditional website

5

cookies.  Interaction recording software can, "[u]nbeknownst to [a consumer], TrustedForm captured in

6

real time every second of his interaction with [a website] and created a video recording of that

7

interaction."[16] As FullStory boasts, it provides a video "representation of exactly what the user is seeing"

8

and "stores and analyzes every imaginable point of user interaction with your website or app....".

9

22.    Session Replay Code intercepts activity of shoppers, browsers, consumers seeking refunds,

10

and accidental visitors alike.  It wiretaps user activity by collecting large amounts of data and transmitting

11

it elsewhere to where it can be stored and processed in real time.  When a user visits a website that has the

12

Session Replay Code installed, the JavaScript code will run in the background, collecting data about the

13

user's interactions with the website.  The code can send user data to the developer of the session recording

14

technology, in addition to the proprietor of the website where the code is installed.

15

23.    Session Replay Code is comprehensive in its tracking, covering scrolls, zooms, clicks, text

16

input, text edits and deletions, window resizes, and many other aspects of trying out and transacting with

17

a website. This is typically done using a combination of backend technologies, such as servers, databases,

18

and cloud storage solutions. These technologies are used to aggregate the data and make it accessible for

19

replay and analysis.  In order to play back visit or "session" information, the Session Replay Code must

20

record activity at short intervals, ones as short as mere milliseconds.  Data is transmitted to third parties

21

periodically so as to be immediately and automatically processed for replay.

22

---

[16]    *Javier v. Assurance IQ, LLC*, No. 21-16351, slip op. (9th Cir. 2022), https://cdn.ca9.uscourts.gov/datastore/memoranda/2022/05/31/21-16351.pdf

23

24

**FIRST AMENDED CLASS ACTION COMPLAINT**

25

24.     Once the data is stored, the third-party vendor can then use it to create a replay of the user's session. This is typically done by creating a separate webpage that plays back the data collected from the user's interactions. The webpage can be made to look like the original website, and the replay can be made to move at a slower pace so that the user can better understand what was happening during the session. The visible appearance of the user's visit is therefore transmitted to the Session Replay Provider such as FullStory.

25.     Session Replay Code is unlike cookies, which merely record whether a particular website has been visited by a user at all, which is analogous to a user entering a physical retail store. Instead, it "goes beyond traditional surveillance" because "mouse movements, hovers, and clicks happen in the user's own [physical] space."[17]

26.     Session Replay Code is so invasive and intercepts so much data that credit card data, medical information, and personally identifiable information may be transmitted to FullStory, and it may further disclose that information to other third parties, whether voluntary or due to a "passive man in the middle security breach where a hacker … can extract sensitive data."[18]

27.     In addition, Session Replay Code may record data entered accidentally or that is removed for privacy reasons on second thought, due to the nature of the order or the other factors. Keystrokes entered into a form but not submitted may be recorded and played back despite the user being informed that he or she could decline to submit the data to the website, let alone third parties such as FullStory.

---

[17] Frances S. Grodzinsky, Keith W. Miller & Marty J. Wolf, Session replay scripts: A privacy analysis, 38 The Information Society 257, 258, 261 (2022); see also Do I need to inform my users that their behavior is being logged?, FullStory, https://help.fullstory.com/hc/en-us/articles/360020622934-Do-I-need-to-inform-my-users-that-their-behavior-is-being-logged- (last visited Jan. 8, 2023) ("We also log the details of your visits to our website and information generated in the course of using our website, such as mouse movements, clicks, page visits, text entered, how long you spent on a page, and other details of your actions on our website.").
[18] Grodzinsky, Miller & Wolf, supra note 17, at 263.

**FIRST AMENDED CLASS ACTION COMPLAINT**

1

2

28.     Session Replay Code is not anonymous. FullStory announces that it will identify a person across related domains.[19]

3

4

5

6

29.     It is not possible to maintain user anonymity when "Website owners who use FullStory Services can watch a DVR-like video playback of user sessions on their website, enabling meaningful insight into their users' experience, as an effective way to identify usability problems and other areas for improvement."[20]

7

30.     Even passwords may be intercepted when keystrokes are recorded.

8

9

31.     In addition, cookie technology permits linking FullStory's DVR-like session videos to specific persons.[21]

10

11

32.     Recently developed technology also makes it possible to fingerprint a device, or match hardware or software to him or her.  This permits the tracking of persons across websites.

12

13

14

33.     Session Replay Code, when used in conjunction with cookie technology and device fingerprinting, permits Defendants to circumvent privacy or "incognito" mode on visitors' Internet browsers, as well as Virtual Private Network or VPN privacy protections.

15

16

17

18

19

34.     By operating continuously and at the level of detail of a DVR, Session Replay Code also degrades device performance and places Defendants' website visitors to increased risk of identity theft and invasions of privacy.  In the Federal Trade Commission's ground-breaking consent decree with Facebook over personal data sharing, the Commission found it to be "deceptive" to use "tactics allowed the company to share users' personal information with third-party apps" when "many users were unaware

20

21

22

23

[19] *Id.* at 266.
[20] *Id.* at 264.
[21] *Id.* at 259.

24

-10-

**FIRST AMENDED CLASS ACTION COMPLAINT**

25

1  that [the company] was sharing such information, and therefore did not take the steps needed to opt-out

2  of sharing."[22]

3  **D.  Defendants Wiretap the Website Communications**

4       35.    Defendants created and maintain the website www.bloomingdales.com.  They use it to sell

5  clothing, shoes, accessories, and other goods.

6       36.    Defendants have used Session Replay Code to intercept Website Communications on

7  www.bloomingdales.com and to share them with third parties including FullStory. FullStory and the other

8  third parties are not parties to the Website Communications, and Plaintiff and the Class Members had no

9  reason to believe that their communications were being recorded and replayed in this way.

10      37.    FullStory creates and updates Session Replay Code called FullStory and FullStory for

11  Mobile Apps.  FullStory for Mobile Apps may have had dozens of versions.

12      38.    FullStory captures and plays back such user activity as mouse movements, hovers, clicks,

13  taps, text entry, other keystrokes, menu selections, and page visits.

14      39.    Click tracking enables companies to see which links and buttons users are interacting with,

15  and how often they are being clicked.  This information can be used to optimize the placement of important

16  links and buttons, or to determine which elements are not getting the desired level of engagement.

17  Scrolling and tapping tracking also extracts valuable user behavioral data.  For example, if a large number

18  of users are scrolling to the bottom of a page, it could track their interest and purchase intent second by

19  second.

20

21

22  _____

[22] Press Release, Federal Trade Commission, FTC Imposes $5 Billion Penalty and Sweeping New Privacy
23  Restrictions on Facebook (July 24, 2019), https://www.ftc.gov/news-events/news/press-releases/2019/07/ftc-
   imposes-5-billion-penalty-sweeping-new-privacy-restrictions-facebook.

24                                        -11-
                          **FIRST AMENDED CLASS ACTION COMPLAINT**

25

40.     Defendants knowingly derive a benefit and profit from the Website Communications captured and replayed via its website.

41.     Defendants' benefit and profit from interception of the Website Communications is unlawful, deceptive, and unfair under California statutory and common law.

### E.  Plaintiff's and Class Members' Experience with FullStory

42.     Plaintiff has visited www.bloomingdales.com while in California.  Specifically, Plaintiff accessed www.bloomingdales.com via the web browser on both her phone and computer.

43.     Plaintiff was subjected to the interception of her Website Communications with www.bloomingdales.com, via Defendants' actions and omissions relating to FullStory.

44.     Defendants designed www.bloomingdales.com to rely upon, and extract personal private data using, Session Replay Code.

45.     Upon information and belief, Plaintiff's and the Class Members' Website Communications were not only intercepted but were transmitted to one or more third parties including FullStory.

46.     For example, when using www.bloomingdales.com, if a visitor clicks on a product, this click will be intercepted by Session Replay Code, at the very minimum.

47.     Similarly, when using www.bloomingdales.com to fill a cart or "Wish List," this decision will be intercepted and transmitted to FullStory by Session Replay Code.

48.     The Session Replay Code works in the same way for all U.S. visitors to www.bloomingdales.com including all putative Class members.

49.     Each Class member had their Website Communications intercepted.

### F.  Defendants Use Meta Pixel to Record Visitor Sessions

50.     Another provider Defendants use to surreptitiously record user sessions is Meta.

**FIRST AMENDED CLASS ACTION COMPLAINT**

51.     Meta is a personal data service that extracts monetary value from personal data exfiltrated from other websites and managed by Meta.[23]

52.     Meta Pixel is computer software that records users' activity on sites all around the Internet and transmits logs of that activity back to Meta. Most websites do not use it.

53.     Meta recommends that its users deploy the Meta Pixel surreptitiously. It recommends deploying its "code between the opening and closing <head> tags on every page where you will be tracking website visitor actions" so as to "reduce[] the chances of browsers or third-party code blocking the [P]ixel's execution" and "increas[e] the chance that your visitors are tracked before they leave your page."[24]

54.     The Meta Pixel code transmits information including the sub-pages that visitors see, the buttons they click, the options they select (e.g., from a multiple-choice form), and often the things they type.

55.     Meta assembles the personal information it acquires into "shadow profiles."  Although then-Facebook CEO Mark Zuckerberg, now Meta Platforms CEO, claimed not to be aware of the existence of such profiles in congressional testimony, Business Insider reported this year that Meta has recently posted an obscure webpage containing instructions to delete a non-user's email address or

---

[23] *Adkins v. Facebook, Inc.*, 424 F. Supp. 3d 686, 694 (N.D. Cal. 2019); Personal Data: The Emergence of a New Asset Class, World Economic Forum 29-30 (2011), https://www3.weforum.org/docs/WEF_ITTC_PersonalDataNewAsset_Report_2011.pdf.    Due    to    reduced competition since Facebook acquired WhatsApp, the absence of "meaningful competition" has allowed Facebook to "provide lower levels of service quality on privacy and data protection than it would have to provide in a competitive market." *FTC v. Facebook, Inc.*, 581 F. Supp. 3d 34, 55 (D.D.C. 2022)
[24]    Get    Started    -    Meta    Pixel    -    Facebook    for    Developers,    Facebook    (2023), https://developers.facebook.com/docs/meta-pixel/get-started.

-13-

**FIRST AMENDED CLASS ACTION COMPLAINT**

telephone number, but not other information, from such profiles.[25] One expert opined that this would be futile given the vast remaining data in the profiles.

56.    In a 2021 report, the New York State Department of Financial Services found that "Facebook did indeed—unwittingly, it contends—receive, store, and analyze sensitive data" and that Facebook "rebuffed NYDFS's efforts to obtain information ... about, among other things, specifically what kinds of sensitive information was obtained, how regularly it was received, or which app developers violated the rules by transmitting such information."[26]

57.    In April 2022, investigative reporters at The Markup published a report indicating that e-commerce websites were surreptitiously using Meta Pixel to spy on their visitors.  They reported:

> Have you ever shopped for a product online only to see the item appear ad nauseam in your Facebook or Instagram feeds? This is often the result of the Meta Pixel (formerly called the Facebook Pixel), a sophisticated snippet of computer code used for tracking you around the web, embedded in the HTML of a website. This code works by sending Meta, Facebook's parent company, a detailed log of such user interactions as clicking on a product. The pixel's data collection is not limited to e-commerce: Even websites processing sensitive information (defined below), such as online gambling apps, can have the pixel installed. Few people are aware of how expansively Meta tracks their activities....
>
> [The] pixel's functionality and tracking have grown quite expansive. Now the Meta Pixel is a mechanism that loads JavaScript code capable of collecting detailed and granular data for every interaction on a page. With all of this complexity, referring to it as only a "pixel" can be misleading.[27]

A pixel is defined as one "of the small discrete elements that together constitute an image (as on a television or digital screen)," so use of the term "The Pixel" or "The Meta Pixel" is a false and misleading

---

[25] Shona Ghosh, Facebook probably has your phone number and email address. Now it has a secret tool to let you delete it., Business Insider US (Oct. 31, 2022), https://www.businessinsider.co.za/facebook-has-hidden-tool-to-delete-your-phone-number-email-2022-10.

[26] New York State Department of Financial Services, Report on Investigation of Facebook Inc. Data Privacy Concerns 8 (2021), https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.

[27] Surya Mattu, Angie Waller, Simon Fondrie-Teitler, & Micha Gorelick, How We Built a Meta Pixel Inspector, The Markup (Apr. 28, 2022), https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.

**FIRST AMENDED CLASS ACTION COMPLAINT**

representation of fact, i.e. that this code is an image not a form of spyware. Pixel – noun, in Merriam-Webster.com Dictionary (2022), https://www.merriam-webster.com/dictionary/pixel.

58.     Meta Pixel uses Advanced Matching to link an Internet user's session with a Facebook profile, even if the user has third-party cookies disabled. "With Advanced Matching, personal information such as name, email, gender, address, or birth date that a site knows about a visitor or that is entered in forms on the website can be collected and used to connect other event data to the Facebook user."[28] This practice compounds the risk of identity theft, disclosure of personally identifiable information to further unauthorized recipients, etc.

59.     Meta offers Meta Pixel for free under the guise of allowing site owners to "measure the effectiveness of [their] advertising by understanding the actions people take on their website."[29]  In reality, Meta Pixel is a tool for Meta to demonstrate the effectiveness of and sell more advertising on its own platforms.

60.     Meta sells advertising on its platforms, including on Facebook and Instagram.[30]  Indeed, advertising sales accounts for nearly all of Meta's revenue.[31]

61.     Thus, when Meta intercepts website user data through Meta Pixel, it uses that data both for the benefit of the website owner (in this case, Defendants) and also, for its own benefit to generate advertising sales on Meta's platforms.

### G. Plaintiff's and Class Members' Experience with Meta Pixel

---

[28] *Id.*
[29] https://www.facebook.com/business/help/742478679120153?id=1205376682832142.
[30] https://www.facebook.com/business/ads
[31]    *See*    https://s21.q4cdn.com/399680738/files/doc_news/Meta-Reports-Fourth-Quarter-and-Full-Year-2022-Results-2023.pdf (showing that advertising revenue accounted for $31.254 billion out of Meta's total $32.165 billion in revenue for Q4 2022)

**FIRST AMENDED CLASS ACTION COMPLAINT**

62.    Plaintiff was subjected to the interception of her Website Communications with www.bloomingdales.com, via Defendants' actions and omissions relating to Meta Pixel.

63.    Defendants designed www.bloomingdales.com to rely upon and extract personal private data using Meta Pixel.

64.    Upon information and belief, Plaintiff's and the Class Members' Website Communications were not only intercepted but were transmitted to one or more third parties including Meta.

65.    For example, when using www.bloomingdales.com, if a visitor clicks on a product, this click will be intercepted by Meta Pixel.

66.    Similarly, when using www.bloomingdales.com to fill a cart or "Wish List," this decision will be intercepted and transmitted to Meta by Meta Pixel Code.

67.    The Meta Pixel works in the same way for all U.S. visitors to www.bloomingdales.com including all putative Class members.

68.    Each Class member had their Website Communications intercepted using the Meta Pixel.

## CLASS ALLEGATIONS

69.    Plaintiff brings this action individually and as a class action on behalf of a proposed Class and Subclass pursuant to Federal Rule of Civil Procedure 23.

70.    Plaintiff proposes the following Class and Subclass, consisting of and defined as:

Class: All natural persons in the United States whose Website Communications were captured through the use of Session Replay Code or Meta Pixel code embedded in www.bloomingdales.com.

Subclass: All natural persons in the State of California whose Website Communications were captured through the use of Session Replay Code or Meta Pixel code embedded in www.bloomingdales.com.

-16-

**FIRST AMENDED CLASS ACTION COMPLAINT**

71.     Excluded from the Class are Defendants, any corporate entity or division in which Defendants have a controlling interest, Defendants' parents and subsidiaries, Defendants' corporate affiliates, Defendants' officers and directors, all persons who make a timely election to be excluded from the Class, the judge to whom this case is assigned and any immediate family members thereof, and the attorneys who enter their appearance in this action.

72.     <u>Numerosity</u>: The members of the Class are so numerous that individual joinder of all Class members is impracticable. The precise number of Class members and their identities may be obtained from the books and records of Defendants, FullStory, and Meta.

73.     <u>Commonality</u>: This action involves questions of law and fact that are common to the Class members. Such common questions include, but are not limited to:

- o   Whether Defendants intercepted any communications with Class Members.
- o   Whether Defendants employed Session Replay Providers to record Defendants' website visitors' Website Communications.
- o   Whether Defendants operated or participated in the operation of an eavesdropping device.
- o   Whether Defendants aided or abetted eavesdropping or wiretapping, or conspired in it.
- o   Whether Defendants derive a benefit or information from the illegal use of an eavesdropping device.
- o   Whether Defendants acquired the contents of Class Members' private electronic communications without their consent.
- o   Whether Plaintiff and Class members had a reasonable expectation of privacy in their Website Communications.
- o   Whether Defendants' policy or practice of intercepting Class Members digital communications constitutes a violation of 18 U.S.C. § 2520.
- o   Whether Defendants' policy or practice of intercepting Class Members digital communications constitutes a violation of Cal. Penal Code § 631.
- o   Whether Plaintiff and Class Members were aware of Defendants' session replay spyware and had consented to its use.
- o   Whether third-party session replay vendors, such as FullStory, acquired the content of Plaintiff's and the Class Members' communications.
- o   Whether Meta acquired the content of Plaintiff's and the Class Members' communications;
- o   Whether the Class members provided Meta with authorization to acquire their communications with Defendants.
- o   Whether the Pixel's presence and use on www.bloomingdales.com is highly offensive.

**FIRST AMENDED CLASS ACTION COMPLAINT**

o   Whether Defendants' advertisements and marketing of their websites were unfair, false, fraudulent, and/or misleading by failing to disclose the acts and practices described above.
o   Whether Plaintiff and the Class are entitled to damages as a result of Defendants' conduct.
o   Whether Plaintiff and the Class are entitled to reasonable attorneys' fees.
o   Whether Plaintiff and class members are entitled to declaratory relief, injunctive relief and/or restitution under Cal. Bus. & Prof. Code § 17535.
o   Whether Defendants' practices violate California Business and Professions Code § 17500.
o   Whether Defendants' practices violate California Business and Profession Code § 17200.
o   Whether Defendants' interception of Plaintiff's and Class members' Website Communications is a deceptive or fraudulent act or practice intended to result in the sale of consumer goods.
o   Whether Defendants' interception of Plaintiff's and Class members' Website Communications is an unfair or unlawful act or practice.
o   Whether Defendants intruded upon the seclusion of Plaintiff and the Class Members in violation of the common law of California.
o   Whether Defendants trespassed upon the chattels of Plaintiff and the Class Members in violation of the common law of California.
o   Whether Defendants reaped economic value from the private personal information of Plaintiff and the Class Members and were unjustly enriched thereby.
o   Whether the personal information of Plaintiff and the Class Members has economic value.
o   Whether Defendants unjustly profited from its capture and transmission to third parties of Plaintiff's and the Class Members' personal information.
o   Whether Plaintiff and Class members are entitled to equitable relief under federal law.
o   Whether Plaintiff and the Class members are entitled to actual, statutory, punitive, or other forms of damages, and other monetary relief

74.   <u>Typicality</u>: Plaintiff's claims are typical of the other Class members' claims because the nature of the conduct and the injury to privacy are the same for each visitor to Defendants' website. Moreover, each Class member was subjected to the uniform acts and practices of Defendants described above. Each Class Member experienced the capture of his or her Website Communications.

75.   <u>Adequacy of Representation</u>: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including consumer protection litigation. Plaintiff has no interest that is antagonistic to the interests of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of

**FIRST AMENDED CLASS ACTION COMPLAINT**

the Class, and they have the resources to do so.  Neither Plaintiff nor her counsel have any interest adverse to the interests of the other members of the Class.

76.     <u>Superiority</u>: This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

77.     <u>Predominance</u>: Common questions of law and fact predominate over any questions affecting only individual Class members.  A common pattern and practice of privacy violations are the predominant question to be tried. Individual questions, if any, are relatively minor in relation to the common questions listed above.

78.     <u>Ascertainability</u>: Members of the Class and of the Subclass are ascertainable. Class and Subclass membership is defined using objective criteria and Class members may be readily identified through Defendants' books and records as supplemented by the books and records of FullStory and Meta.

## **TOLLING ALLEGATION**

79.     Any applicable statute of limitations should be tolled by the Discovery Rule stated in California Code of Civil Procedure section 335.1.  Prior to the commencement of this action, Plaintiff and other Class Members did not know of facts that would have caused a reasonable person to suspect that he or she had suffered harm that was caused by Defendants' conduct.  In addition, the exercise of reasonable

**FIRST AMENDED CLASS ACTION COMPLAINT**

1   diligence and a good-faith investigation would not have disclosed that a harmful product or situation

2   contributed to the Plaintiff's harm prior to the commencement of this action.

3                           **FIRST CAUSE OF ACTION**

    **VIOLATION OF THE WIRETAP ACT**

4                           **18 U.S.C. § 2510 et seq.**

5

6       80.     Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this

7   complaint.

8       81.     The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986,

9   prohibits the intentional interception of any wire, oral, or electronic communication without a court order,

10  as well as the intentional disclosure or use of the contents of any wire or electronic communication

    knowing it to have been obtained in violation of the Wiretap Act. 18 U.S.C. § § 2511(1)(a), 2511(c),

11  2511(d).

12      82.     Under 18 U.S.C. § 2520(a) any person whose wire, oral, or electronic communication is

13  intercepted, disclosed, or used in violation of section 2511 has a private right of action to remedy such act

14  or practice.

15      83.     Defendants surreptitiously intercepted Plaintiff's and Class Members' Website

16  Communications without their consent when Defendants acquired copies of the Session Replay Code data

17  captured from Plaintiff and Class Members during their use of www.bloomingdales.com.

18      84.     Plaintiff and Class Members had no reason to believe that Defendants were utilizing

19  unusual and novel Session Replay Code and Meta Pixel Code to track and intercept their Website

20  Communications.

21

22

23

24                              -20-

    **FIRST AMENDED CLASS ACTION COMPLAINT**

25

85.     By embedding the Session Replay Code and Meta Pixel Code into its site, Defendants conspired with and aided and abetted FullStory and Meta in intentionally intercepting and acquiring the contents of Plaintiff's and Class Members' Website Communications, in violation of 18 U.S.C. § 2511.

86.     Plaintiff and Class Members are persons whose wire and electronic communications were intercepted by Defendants.  Under section 2520, they are entitled to injunctive and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each violation, actual damages, punitive damages, and reasonable attorneys' fees and costs.

<div align="center">

**SECOND CAUSE OF ACTION**

**UNLAWFUL WIRETAPPING AND INTERCEPTION OF ELECTRONIC COMMUNICATIONS**

**<u>CALIFORNIA PENAL CODE § 631</u>**

</div>

87.     Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

88.     Defendants intercepted Website Communications of Plaintiff's and Subclass Members without their consent when Defendants acquired copies of the Session Replay Code data captured from Plaintiff and Subclass Members during their use of www.bloomingdales.com from within the State of California.

89.     Plaintiff and Subclass Members did not know Defendants were capturing and recording their keystrokes and other Website Communications until after Defendants had done so, and they did not consent to such interception and disclosure to FullStory and Meta of their Website Communications.

90.     Until the filing of this complaint, Plaintiff was completely unaware that Defendants had deployed Session Replay Code and the Meta Pixel Code and could not have consented in a timely manner.

<div align="center">

-21-

**FIRST AMENDED CLASS ACTION COMPLAINT**

</div>

91.    Defendants never advised Plaintiff or the other Subclass Members that they would be intercepting and using the Website Communications as described above.

92.    A violation of California Penal Code section 631(a) requires that the defendant, "by means of any machine, instrument, contrivance, or in any other manner" intentionally "taps, or makes any unauthorized connection, … electrically, … or otherwise, with any telegraph or telephone wire, line, cable, or instrument," or willfully and "without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any ... communication" during its transit or passage over a wire or line/cable or during sending or receipt to or from any place within California, or uses, or attempts to use any information tapped or learned in such a way, or aids, "agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any" such act or acts.

93.    Section 631(a) applies to computers, electronic communications, and websites browsing histories, as well as to telephones. See, e.g., *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020); *Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006).

94.    By embedding the Session Replay Code and Meta Pixel Code into its site, Defendants willfully and without the consent of Plaintiff and the Subclass Members, and in an unauthorized manner, conspired with FullStory and Meta to permit them to intercept the contents of the Subclass Members' Website Communications while they were in transit or during their sending or receipt.

95.    Plaintiff and the Subclass Members seek $2,500 per violation and such other relief as may be authorized by section 631.

-22-

**FIRST AMENDED CLASS ACTION COMPLAINT**

### THIRD CAUSE OF ACTION
### DECEPTIVES ACTS OR PRACTICES
### CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17500

96. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

97. Plaintiff, each Subclass Member, and Defendants are each a "person" as defined by California Business & Professions Code § 17506.

98. The State of California makes it "unlawful for any person to make or disseminate or cause to be made or disseminated before the other public in this state . . . in any advertising devise . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. and Prof. Code § 17500.

99. Defendants engaged in a scheme of advertising that knowingly induced consumers to shop at www.bloomingdales.com, and to traffic in and transmit their personal information to third parties such as Meta and FullStory using representations of fact which Defendants knew or should have known to be false and/or misleading, while failing to disclose the unusual and harmful acts and practices described above.

100. Plaintiff and Subclass Members lost personal information having a non-minimal economic value as a result of Defendants' causing to be disseminated statements regarding the performance or disposition of services including services provided via www.bloomingdales.com.

-23-

**FIRST AMENDED CLASS ACTION COMPLAINT**

101.    Plaintiff and Subclass Members have been subjected to an additional and excess risk of identity them because multiple copies of their personal information have been trafficked and transmitted by Defendants to third parties.

102.    As a result, Defendants' conduct as described above and herein is in violation of section 17500. Thus, Plaintiff and the Subclass is entitled to monetary and injunctive relief.

<div align="center">

**FOURTH CAUSE OF ACTION**

**UNFAIR OR UNLAWFUL ACTS OR PRACTICES (SESSION REPLAY)**

<u>**CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200**</u>

</div>

103.    Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

104.    Plaintiff and Defendants are "person[s]" as defined by California Business & Professions Code section 17201. California Bus. & Prof. Code section 17204 authorizes a private right of action on both an individual and representative basis.

105.    California Business and Professions Code Section 17200 declares to be "unfair competition" four types of acts or practices: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising."  Unfair competition need not qualify as all four of these types of wrong to be actionable.

106.    Defendants engaged in unlawful conduct under section 17200 et seq., including violations of the Wiretap Act and the Penal Code.

107.    In transmitting to third parties the content of Plaintiff's and the Subclass Members' communications relating to users' financial and personal information, Defendants had a purpose that was tortious, criminal, and designed to violate California's constitutional provisions, including:

**FIRST AMENDED CLASS ACTION COMPLAINT**

- violation of the Wiretap Act, 42 U.S.C. § 2510 et seq.

- violation of Cal. Penal Code § 631;

- violation of the Federal Trade Commission Act, section 5, under *Federal Trade Commission v. Sperry and Hutchinson Co.*, 405 U.S. 233 (1972);

- a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person in violation of the common law;

- violation of the California Consumer Legal Remedies Act, as described below;

- an intentional and wrongfully intermeddling with the personal property of another that substantially and unjustifiably impairs the value of that property; and

- violation of Article I, section 1 of the California Constitution, protecting the inalienable right of all persons to privacy against private actors as per *Hernandez v. Hillsides, Inc.,* 211 P. 3d 1063 (Cal. 2009)

108.    Defendants knew that such conduct would be highly offensive, yet continued to use session replay and Meta Pixel for the above purposes.

109.    Defendants had other reasonably available alternatives to further its legitimate business interest, other than the conduct described herein, such as using traditional cookies or using session replay and/or Meta Pixel with an adequate disclosure of their presence, eavesdropping capabilities, and added risks of identity them and privacy violations.

### *Unfair Prong*

110.    Defendants' actions and representations constitute an "unfair" business act or practice under section 17200 in that Defendants' conduct is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers, and is against public policy in a way that is not justified by the benefits, if any, obtainable only by such conduct. Among other things, it is an unfair business act or practice for Defendants to utilize untested, unusual, and alarming methods to intercept and transmit to third parties the Website Communications without soliciting the prior and informed consent of the

**FIRST AMENDED CLASS ACTION COMPLAINT**

Subclass Members.  It is also an unfair business act or practice for Defendants to not provide visitors with transparency and an accurate account of how their Website Communications will be captured and replayed, including by third parties.  In the alternative, Defendants' conduct is an "incipient violation" of the Wiretap Act and section 631 of the California Penal Code, violates the "policy or spirit" of these enactments, and "significantly threatens or harms" consumer privacy.

111.    Defendants' conduct is ongoing and continues to this date.

*Fraudulent Prong*

112.    California Business & Professions Code section 17200 provides a remedy for any "fraudulent … business act or practice."  Such an act or practice need only be likely to deceive members of the public.

113.    An omission of a fact a defendant was obligated to disclose is actionable under California Business and Professions Code section 17200.

114.    A duty to disclose exists whenever a defendant has exclusive knowledge of facts not known to the plaintiff, or a defendant actively conceals a material fact from the plaintiff.  is whether the public is likely to be deceived. Unlike common law fraud, a § 17200 violation can be established even if no one was actually deceived, relied upon the fraudulent practice, or sustained any damage.

115.    Here, a consumer would be made to believe that they were being subjected to ordinary privacy practices, not the surreptitious recording of every click and keystroke and its transmission to third parties unbeknownst to them.  Defendants had exclusive knowledge of the presence and operation of the Session Replay Code on their website until the commencement of this action.

116.    Defendants' failure to disclose the interception and transmission of the Subclass Members' Website Communications using Session Replay Code embedded in www.bloomingdales.com is material

**FIRST AMENDED CLASS ACTION COMPLAINT**

because the Subclass Members would not otherwise be as likely to visit its website to search for, purchase, and contract to purchase merchandise.

117.     Defendants' failure to disclose the acts and practices described above was likely to mislead reasonable consumers under the circumstances, and thus constitutes an unfair and deceptive trade practice in violation of the CLRA.

118.     As a direct and proximate result of these unfair and deceptive practices, Plaintiff and each member of the Subclass has suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Defendants. The collection and use of this information has now diminished the value of such information to Plaintiff and the Subclass.

119.     Plaintiff and Subclass Members have been subjected to an additional and excess risk of identity theft because multiple copies of their personal information has been trafficked and transmitted by Defendants to third parties, including third parties subject to recent and/or ongoing data breaches.

120.     Therefore, Defendants have violated the "fraudulent" prong of California Business & Professions Code section 17200.

121.     As such, Plaintiff and the Subclass seek an order (1) requiring Defendants to cease the lawful, fraudulent, and unfair practices described herein; and (2) awarding disgorgement and restoration of the value of the Subclass Members' personal information to its former state.

122.     Defendants' conduct is ongoing, and it continues to unlawfully intercept the communications of Plaintiff and Subclass members any time they visit Defendants' website with Session Replay Code enabled without their consent.  Plaintiff and Subclass members are entitled to injunctive relief to prevent future interceptions of Website Communications.

**FIRST AMENDED CLASS ACTION COMPLAINT**

**FIFTH CAUSE OF ACTION**

**CALIFORNIA CONSUMER LEGAL REMEDIES ACT**

<u>**CAL. CIV. CODE 1770(a)**</u>

123.    Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

124.    Defendants violated the Consumer Legal Remedies Act (CLRA), section 1770(a) of the Cal. Civ. Code, by omitting and/or concealing material facts about www.bloomingdales.com. Specifically, Bloomingdale's omitted and/or concealed that it designed and continuously used Session Replay Code to surreptitiously intercept and transmit the Website Communications.

125.    The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer." Cal. Civ. Code § 1770(a).

126.    An omission of a fact the defendant was obligated to disclose is actionable under the CLRA. A duty to disclose exists whenever the defendant has exclusive knowledge of facts not known to the plaintiff, or the defendant actively conceals a material fact from the plaintiff.  is whether the public is likely to be deceived. Unlike some states' version of common law fraud, the CLRA does not necessarily require an affirmative misstatement, actual reliance, or causation of specific injury or damage.

127.    Here, a consumer would be made to believe that they were being subjected to ordinary privacy practices, not the surreptitious recording of every click and keystroke and its transmission to third parties unbeknownst to them.  Defendants had exclusive knowledge of the presence and operation of the Session Replay Code on their website until the filing of this complaint.

128.    Had Plaintiff and Subclass members known that the Session Replay Code was embedded in Defendants website, they would not have visited www.bloomingdales.com to shop for, buy, and offer

to buy goods, or they would have required Defendants to compensate them for the interception and trafficking in their Website Communications.

129.    Defendants' failure to disclose the interception and transmission of the Subclass Members' Website Communications using Session Replay Code embedded in www.bloomingdales.com is material because the Subclass Members would not otherwise be as likely to visit their website to search for, buy, and offer to buy goods, resulting in less data for Defendants in trafficking.

130.    Defendants' failure to disclose the acts and practices described above was likely to mislead reasonable consumers under the circumstances, and was willful and wanton in nature, having thus violated the CLRA.

131.    As a direct and proximate result of these unfair or deceptive practices in transactions intended to result in the sale of goods to consumers, Plaintiff and the Subclass Members suffered actual harm in the form of money and/or property because the disclosure of their Website Communications has value as demonstrated by the collection and use of it by Defendants. The manner in which the Subclass Members' personal data has been captured and transmitted to third parties has reduced the value of such information to Plaintiff and the Subclass Members.

132.    Plaintiff and Subclass Members have been subjected to an additional and excess risk of identity theft because multiple copies of their personal information has been trafficked and transmitted by Defendants to third parties, including third parties subject to recent and/or ongoing data breaches.

133.    As such, under section 1780(a) of the Civ. Code, Plaintiff and the Subclass Members seek actual damages, punitive damages, injunctive relief, and such other relief which the court considers appropriate.

**FIRST AMENDED CLASS ACTION COMPLAINT**

134.     Defendants' conduct is ongoing, and the Session Replay Code continues to unlawfully intercept the communications of Plaintiff and Subclass members any time they visit Defendants' website. Plaintiff and Subclass members are entitled to declaratory and injunctive relief to prevent future interceptions of their communications.  They would shop at www.bloomingdales.com but for the unfair and deceptive use of the Session Replay Code and Meta Pixel on it.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, the Class Members, and the Subclass Members pray that judgment be entered against Defendants, and Plaintiff, the Class Members, and the Subclass Members be awarded monetary and other relief from Defendants, as follows:

- o Certify the Class and the Subclass as requested herein;

- o Appoint Plaintiff to serve as the Class Representative for the Class and Subclass;

- o Appoint Plaintiff's Counsel as Class Counsel and Subclass Counsel in this matter;

- o Preliminary and other equitable or declaratory relief on behalf of the Class Members as may be appropriate under 18 U.S.C. § 2520(b)(1);

- o The greater of $10,000 or $100 per day for each Class Member for each violation of 18 U.S.C. § 2510 et seq., pursuant to 18 U.S.C. § 2520(b)(2) and 18 U.S.C. § 2520(c)(2)(B);

- o Compensatory damages for each Subclass Member pursuant to Cal. Code of Civ. Proc. § 1780(a) and the common law of California;

- o Punitive damages for each Subclass Member pursuant to Cal. Code of Civ. Proc. § 1780(a) and the common law of California;

- o $2,500 to each Subclass Member pursuant to California Penal Code § 631(a).

- o Restitution on behalf of the Subclass Members pursuant to Cal. Bus. & Prof. Code § 17203.

- o Reasonable attorneys' fees and other litigation costs reasonably incurred on behalf of the Class Members pursuant to 18 U.S.C. § 2520(b)(3);

**FIRST AMENDED CLASS ACTION COMPLAINT**

o   Reasonable attorneys' fees incurred on behalf of the Subclass Members pursuant to Cal. Code of Civ. Proc. § 1021.5;

o   Preliminary and other equitable or declaratory relief on behalf of the Subclass Members to prevent the further violations of California Penal Code § 631, California Business and Professions Code § 17200, and California Business and Professions Code § 17500, and the common law of California, including pursuant to Cal. Bus. & Prof. Code § 17203.

o   An award of costs to Plaintiff; and

o   Any other relief the Court may deem just and proper including interest.

## TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff and Class Members are entitled to, and demand, a trial by jury.

Dated:  June 6, 2023

LEEDS BROWN LAW, P.C.

By:   _Brett R Cohen_

Brett R. Cohen (SBN 337543)
LEEDS BROWN LAW
One Old Country Road, Suite 347
Carle Place, NY 11514-1851
Tel: (516) 873-9550
bcohen@leedsbrownlaw.com

*Attorneys for Plaintiff & Putative Class*

-31-

**FIRST AMENDED CLASS ACTION COMPLAINT**